DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
MARC J. BLAU (Cal. Bar No. 198162)
Email: blaum@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Brent Wilner, Associate Director
Stephen Kam, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>RYVYL, INC., FREDI NISAN, and BENZION ERREZ,<br><br>          Defendants. | Case No.    **'26 CV 2672 WQH MMP**<br><br>**COMPLAINT** |

1

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a).

2. The defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because the individual Defendants reside in this district, and Defendant RYVYL, Inc. has its principal place of business in this district.

## SUMMARY

4. This matter concerns a multi-year course of fraudulent conduct by which RYVYL Inc. ("RYVYL"), its chief executive officer, Fredi Nisan ("Nisan") and its chairman of the board, Benzion Errez ("Errez") defrauded the investing public by falsely depicting RYVYL in its public filings with the Commission as a cutting edge "financial technology company that develops, markets, and sells innovative blockchain-based payment solutions" and that its "proprietary blockchain-based technology serves as the settlement engine for all transactions within [its] ecosystem."

5. RYVYL's public filings also detailed its use of a digital "token" to facilitate credit card transactions with merchants using its services.

6. As Nisan and Errez knew, or were reckless in not knowing, these descriptions of the company's business were materially false and misleading. RYVYL's actual business was reselling credit card or ACH processing services of other companies to high-risk merchants, such as cannabis dispensaries. RYVYL never processed any transactions through a blockchain as it claimed in its public filings, nor did it possess any proprietary blockchain technology. Despite specifically describing its use in transactions, RYVYL neither sold nor had a functional digital token.

7. Moreover, until its May 20, 2025 quarterly filing, RYVYL never publicly disclosed that a substantial majority of its transactions involved high-risk merchants, such as cannabis dispensaries, which are disfavored customers by most major credit companies due to the questionable legality of their businesses under federal law.

8. By engaging in this conduct RYVYL, Nisan, and Errez violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In addition, RYVYL, by filing a materially misleading registration statement, and materially misleading annual, quarterly and current reports with the Commission on Forms S-1, 10-K, 10-Q and 8-K, violated Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13, and Nisan and Errez aided and abetted RYVYL's violations of those rules.

9. The SEC requests that the Court impose permanent injunctions against each of the Defendants for their respective violations of the federal securities laws; prohibit Nisan and Errez from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d), pursuant to Section 20(e) of the Securities Act and Section

21(d)(2) of the Exchange Act; and impose civil money penalties against Nisan and Errez pursuant to Section 21(d)(3) of the Exchange Act and Section 20(d) of the Securities Act.

### THE DEFENDANTS

10.   **RYVYL Inc.** is a Nevada corporation, with its principal place of business in San Diego, California.  The company provided payment processing services and point-of-sale software to its merchant clients.  Founded by Nisan and Errez in 2018 as GreenBox POS, LLC ("GreenBox"), the company began trading shares on the OTC markets under the ticker symbol "GBOX" following a reverse merger in April 2018 and was subsequently uplisted to NASDAQ in 2021.  In October 2022, the company changed its name to RYVYL and its ticker symbol to "RVYL."  In September 2025, RYVYL entered into an agreement and plan of merger with RTB Digital Inc. ("RTB"), a privately held media technology company, which was approved by a special meeting of RYVYL's shareholders held on April 1, 2026.  Pursuant to the terms of the merger agreement, a wholly-owned subsidiary of RYVYL will merge with and into RTB, with RTB surviving as a wholly-owned subsidiary of RYVYL.  After the completion of the planned merger, RYVYL will be renamed RTB Digital, Inc., and expects to trade on NASDAQ under the symbol "RTB."  The company's common stock is registered pursuant to Section 12(b) of the Exchange Act.

11.   **Fredi Nisan**, age 44, is a resident of San Diego, California.  Nisan is a co-founder of RYVYL and was the company's chief executive officer from 2017 to October 31, 2025, when he stepped down from the position.

12.   **Benzion Errez**, age 65, is a resident of Escondido, California.  Errez is a co-founder of RYVYL and acted as the chairman of the board and executive vice president of the company from July 2017 to August 2025, when he stepped down from those positions.

4

## THE ALLEGATIONS

**A.     RYVYL Claimed In Its Public Filings That It Owned Proprietary Blockchain Technology That Effectuated Merchant Transactions.**

13.     In its S-1 registration statement filed with the Commission on October 2, 2020, RYVYL claimed to be "a tech company formed with the intent of developing, marketing and selling innovative blockchain-based payment solutions" and that its "proprietary, blockchain-based systems are designed to facilitate, record and store a virtually limitless volume of tokenized assets, representing cash or data, on a secured, immutable blockchain-based ledger."

14.     RYVYL's registration statement further claimed that its "proprietary blockchain-based technology serves as the settlement engine for all transactions within the Company's ecosystem" and that "[u]nlike general blockchain-based systems [RYVYL] uses proprietary, private ledger technology to verify every transaction conducted within the [RYVYL] ecosystem."

15.     RYVYL also claimed that transactions on its ecosystem start with the consumer purchasing tokens issued by the company, which are loaded onto a "virtual wallet" allowing the "transaction experience to seem like any other ordinary credit/debit card transaction to the consumer and the merchant."

16.     From October 2, 2020 to May 10, 2025 (the "Relevant Period") RYVYL's description of its business in its annual, quarterly and current reports filed with the Commission remained substantially similar to the description appearing in its October 2, 2020 S-1 registration statement.

17.     For example, in Forms 10-K for fiscal years 2020 through 2025, RYVYL stated that it was a "financial technology company that develops, markets, and sells innovative blockchain-based payment solutions;" its "proprietary, blockchain-based systems are designed to facilitate, record and store a virtually limitless volume of tokenized assets, representing cash or data, on a secured, immutable blockchain-based ledger" and "serves as the settlement engine for all

transactions within our ecosystem;" and it uses its "proprietary, private ledger technology to verify every transaction conducted within our ecosystem."

18.    RYVYL further explained that "[w]hen consumers use credit/debit cards to pay for transactions with merchants who use our ecosystem, the transaction starts with the consumer purchasing tokens from us. The tokens are purchased or granted directly from the merchant's terminals or mobile app, or from our website and are immediately available for transactions."  RYVYL stated that "[s]ecure tokens are used where users need an immediate transaction, in a safe, private, and secure environment, and where traditional banks may not work effectively, like cross-border transactions or in under-banked verticals."

19.    Similarly, RYVYL's Forms 10-Q repeatedly asserted that RYVYL is a "tech company formed with the intent of developing, marketing and selling innovative blockchain-based payment solutions, which the Company believes will cause favorable disruption in the payment solutions marketplace.  The Company's core focus is to develop and monetize disruptive blockchain-based applications, integrated within an end-to-end suite of financial products, capable of supporting a multitude of industries.  The Company's proprietary, blockchain-based systems are designed to facilitate, record and store a virtually limitless volume of tokenized assets, representing cash or data, on a secured, immutable blockchain-based ledger."

20.    Many of RYVYL's press releases filed on Forms 8-K with the Commission during the Relevant Period also included a description of RYVYL's business in which it claimed that it leverages proprietary blockchain security and token technology and represented that its applications enable an end-to-end suite of turnkey financial products with enhanced security and data privacy, world-class identify theft protection and repaid speed to settlement thereby improving the efficiency of handling large-scale commercial processing volumes for its merchant clients.

**B.**     **The Statements In RYVYL's Public Filings Were Materially Misleading.**

21.     In repeatedly describing itself in its public filings as a provider of "blockchain-based payment solutions," RYVYL made a series of materially misleading statements about the nature of its business.

**1.     RYVYL did not conduct any transactions on a blockchain.**

22.     Contrary to what it repeatedly stated in its public filings during the Relevant Period, RYVYL did not effectuate any transactions on a blockchain. Rather, RYVYL acted as an independent sales organization providing standard credit card and ACH processing services to merchants through third-party processors, none of whom used blockchain technology to effectuate transactions.

23.     Similarly, none of the independent sales organizations that RYVYL had acquired had any blockchain component in their processing.  Rather, they all employed traditional methods to process credit card transactions, *i.e.*, using a gateway processing agent affiliated with a bank.

24.     Although one of RYVYL's products – the QuickCard Payment System, product, which RYVYL described as a comprehensive physical and virtual cash management system – recorded transactions to a private blockchain after a bank or other card processor approved the transaction, RYVYL failed to disclose that the underlying consumer-merchant transactions were conducted outside of RYVYL's private blockchain, just like any standard credit or debit transaction.  In fact, neither the merchant nor the customer had any access to the private blockchain or any interaction with it.

25.     QuickCard transactions were recorded to both RYVYL's private blockchain and a standard structured query language ("SQL") database.  It was the SQL database, and not RYVYL's private blockchain, that was used to support the QuickCard software used by merchants tracking their sales data.

**2.      RYVYL did not own any proprietary blockchain technology.**

26.      Despite repeated references in its public filings and press releases to "proprietary blockchain security," RYVYL did not actually own the technology behind the private blockchain that it used to record QuickCard transactions.

27.      The private blockchain that RYVYL used in connection with QuickCard was developed by a third-party software development company.  RYVYL did not even have a license to that technology.  Nor did RYVYL employ any software developers with blockchain development experience.

**3.      RYVYL did not conduct any transactions using a digital token.**

28.      RYVYL's public filings contained detailed descriptions of how customers purchase digital tokens from RYVYL to conduct credit or debit transactions—a description included in multiple public filings since October 2020.

29.      However, RYVYL never actually implemented a system that facilitated the use of tokens to conduct credit or debt transactions.

**4.  RYVYL made materially misleading claims about its diversified customer base.**

30.      In its Form 10-K for fiscal year 2024, RYVYL touted its strategic approach to industry diversification as a core component of its growth and risk management framework.  As RYVYL explained, "[b]y targeting a broad spectrum of industries – from traditional sectors like retail and financial services to high-growth areas such as e-commerce, technology and digital marketplaces – we effectively minimize reliance on any single market segment.  This diversified focus not only reduces our exposure to sector-specific risk but also positions RYVYL to capitalize on emerging opportunities across the global economy."  RYVYL also claimed that it processed transactions for approximately 1,500 business customers in North America, Europe and Asia, and in over 50 industries.

31.      RYVYL's claims about its diversified customer base and reduced

8

exposure to sector-specific risk were materially misleading because it did not disclose that its principal product, QuickCard, was exclusively promoted to, and used by, cannabis dispensaries.

32. Relatedly, in its Form 10-K for fiscal year 2023, RYVYL reported that in February 2024 it transitioned its QuickCard product in North America away from terminal-based to app-based processing and further reported that this transition "coincided with a change in our banking partner that was prompted by recent changes in the compliance environment and banking regulations." RYVYL stated that "the unforeseen abrupt nature of the transition" led to a significant decline in processing volume in North America and that management anticipated consolidated revenue for the first quarter of 2024 to be down sequentially by approximately 30 percent overall.

33. These statements were also materially misleading. In reality, the reason RYVYL's relationships with its banking partners were terminated was RYVYL's involvement with cannabis merchants, which its banking partners expressly prohibited.

34. Due to federal laws against cannabis sales, Visa, Mastercard, and American Express all prohibit the use of their cards for cannabis sales and prohibit associated banks and gateways from processing those transactions.

35. RYVYL's failure to disclose that its primary product, QuickCard, was primarily marketed to and used by cannabis dispensaries made the company's statements about its diversified payment processing business incomplete and materially misleading.

**C.    RYVYL's Misstatements Were Material.**

36. Each of the aforementioned misrepresentations would have been material to a reasonable investor in making his or her investment decisions. RYVYL consistently marketed itself to investors as "a tech company formed with the intent of developing, marketing and selling innovative blockchain-based payment solutions."

37. However, it did none of these things. As a result, it would have been

important to a reasonable investor to know that RYVYL did not in fact process any transactions on a blockchain, or own proprietary technology to do so.

38.    Moreover, it would have been important to a reasonable investor to know that QuickCard was primarily used to facilitate cannabis transaction because this was a material risk to the company's revenues.

**D.    Nisan And Errez Were Both "Makers" Of The Statements In RYVYL's Public Filings.**

39.    During the Relevant Period, due to their roles, both Nisan and Errez had ultimate authority over the content of RYVVYL's Forms S-1, 10-K, 10-Q, and 8-K, as well as the decision to file them with Commission.

40.    Both Nisan and Errez signed RYVYL's Form S-1 filed with the Commission during the Relevant Period.

41.    Nisan signed RYVYL's annual and quarterly reports filed with the Commission on Forms 10-K and 10-Q during the Relevant Period.

42.    Errez signed RYVYL's annual reports filed with Commission on Forms 10-K during the Relevant Period.

43.    Nisan and/or Errez also signed RYVYL's Forms 8-K filed with the Commission during the Relevant Period.

**E.    Nisan And Errez Acted With Scienter, Which Is Imputed To RYVYL**

44.    Both Nisan and Errez knew, or were reckless in not knowing, that RYVVL's description of its business in its public filings for the Relevant Period was materially misleading.  Specifically, they each knew, or were reckless in not knowing, that:

(a)    None of RYVYL's payment processing was effectuated on a blockchain;

(b)    RYVYL did not own any proprietary blockchain technology;

(c)    RYVYL never sold digital tokens to customers to facilitate credit

10

card transactions;

(d) RYVYL's principal product, QuickCard, was primarily used by cannabis dispensaries;

(e) Because of federal laws against cannabis sales, Visa, Mastercard, and American Express all prohibited the use of their cards for cannabis sales and prohibited associated banks and gateways from processing those transactions; and

(f) Failing to disclose that RYVYL's primary business product, QuickCard, was mainly marketed to and used by cannabis dispensaries rendered the company's statements about its revenue, diversified customer base, and the need to maintain its banking relationships materially incomplete and misleading.

45. By engaging in this conduct, Nisan and Errez acted at least unreasonably, and therefore also acted negligently.

46. Because they engaged in their misconduct described herein while acting in their capacities as RYVYL's CEO and chairman of the board, respectively, Nisan and Errez's scienter and/or negligence may be imputed to RYVYL.

47. During the Relevant Period, RYVYL obtained money by means of its materially misleading registration statement and annual, quarterly and current reports filed with the Commission, as it periodically sold its stock to the public.

48. Through their conduct, and while acting as its agent, Nisan and Errez obtained money and property for RYVYL.

49. Nisan and Errez also obtained salaries, bonuses, stock awards, options awards, and other compensation from RYVYL during the Relevant Period.

50. In addition to the material misstatements and omissions of material fact necessary to make the statements made not misleading in RYVYL's public filings, both Nisan and Errez engaged in deceptive acts in furtherance of RYVYL's fraudulent scheme.

51.    In directly managing RYVYL's operations, Nisan directed QuickCard's operations, knowing that QuickCard did not offer the "blockchain-based payment solution[]" represented in the company's public statements to investors.

52.    Further, Nisan was directly involved with establishing banking relationships that would allow QuickCard to process major credit cards, without disclosing to Visa, American Express or Mastercard that the underlying sales involved cannabis.

53.    Likewise, Errez signed merchant processing agreements that misrepresented the nature of the products to be sold through QuickCard.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against All Defendants)

54.    The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

55.    During the Relevant Period, Defendants RYVYL, Nisan and Errez falsely depicted RYVYL in its public filings with the Commission as a cutting-edge technology company selling innovative and proprietary blockchain-based payment solutions to a well-diversified customer base using digital tokens.  In fact, none of this was true.

56.    By engaging in the conduct described above, Defendants RYVYL, Nisan and Errez, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and/or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses

of business which operated or would operate as a fraud or deceit upon another person.

57. By engaging in the conduct described above, Defendants RYVYL, Nisan and Errez violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

58. The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

59. During the Relevant Period, Defendants RYVYL, Nisan and Errez falsely depicted RYVYL in its public filings with the Commission as a cutting-edge technology company selling innovative and proprietary blockchain-based payment solutions to a well-diversified customer base using digital tokens. In fact, none of this was true.

60. By engaging in the conduct described above, Defendants RYVYL, Nisan and Errez, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instrumentalities of interstate commerce or of the mails: (a) knowingly and recklessly employed devices, schemes, or artifices to defraud; (b) knowingly, recklessly and/or negligently obtained money or property by means of untrue statements of material facts and omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they made, not misleading; and (c) knowingly, recklessly and/or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

61. By engaging in the conduct described above, Defendants RYVYL, Nisan and Errez violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## THIRD CLAIM FOR RELIEF

**False SEC Filings**

**Violations of Section 13(a) of the Exchange Act and**

**Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder**

**(against RYVYL)**

62.     The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

63.     During the Relevant Period, Defendant RYVYL falsely depicted itself in public filings with the Commission as a cutting-edge technology company selling innovative and proprietary blockchain-based payment solutions to a well-diversified customer base and using digital tokens.  In fact, none of this was true.

64.     During the Relevant Period, and as alleged above, RYVYL was an issuer of securities registered pursuant to Section 12 of the Exchange Act and filed annual Forms 10-K, quarterly Forms 10-Q, and current reports on Form 8-K that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20,13a-1, 13a-11 and 13a-13.

65.     By engaging in the conduct described above, Defendant RYVYL violated, and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§ 240.12b-20,13a-1, 13a-11 and 13a-13.

## FOURTH CLAIM FOR RELIEF

**Aiding and Abetting RYVYL's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder**

**(against Nisan and Errez)**

66.     The SEC realleges and incorporates by reference paragraphs 1 through 55 above.

14

67.     During the Relevant Period, Defendants Nisan and Errez falsely depicted RYVYL in its public filings with the Commission as a cutting-edge technology company selling innovative and proprietary blockchain-based payment solutions to a well-diversified customer base using digital tokens.  In fact, none of this was true.

68.     As alleged above, Nisan and Errez substantially assisted RYVYL's primary violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 by reviewing, approving, and/or signing RYVYL's registration statement and its annual, quarterly and current reports filed with the Commission on Forms S-1, 10-K, 10-Q and 8-K during the Relevant Period.

69.     Nisan and Errez knew or were reckless in not knowing that RYVYL's filings contained material misstatements and omissions when Nisan and Errez reviewed, approved, and/or signed them.

70.     By engaging in the conduct described above, Defendants Nisan and Errez aided and abetted RYVYL's violations of, and unless restrained and enjoined will continue to aid and abet violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,13a-1, 13a-11 and 13a-13.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure:

(a)  permanently enjoining RYVYL, Nisan and Errez and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal

15

service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

(b)  permanently enjoining RYVYL and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, from violating Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-11 and 13a-13, 17 C.F.R. §§ 240.12b-20,13a-1, 13a-11 and 13a-13; and,

(c)  permanently enjoining Nisan and Errez and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, from aiding and abetting violations of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20,13a-1, 13a-11, and 13a-13, 17 C.F.R. §§ 240.12b-20,13a-1, 13a-11 and 13a-13.

## III.

Enter an order against Defendants Nisan and Errez pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2), prohibiting them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d).

## IV.

Order Defendants Nisan and Errez to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or

motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: April 27, 2026

/s/ Donald W. Searles

Donald W. Searles
Attorney for Plaintiff
Securities and Exchange Commission